IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ERIC D. HOVDE AND STEVEN D. HOVDE,<br><br>Plaintiffs,<br><br>v.<br><br>ISLA DEVELOPMENT LLC AND JEFFREY T. RIEGEL,<br><br>Defendants. | Case No. 2018 C 07323<br><br>Hon. John Z. Lee<br><br>Magistrate Hon. Maria Valdez |

## SECOND AMENDED AFFIRMATIVE DEFENSES TO PLAINTIFFS' FIRST AMENDED COMPLAINT

The defendants, ISLA Development LLC ("ISLA") and Jeffrey T. Riegel ("Riegel") (ISLA and Riegel are collectively referred to as the "Defendants"), by Gregory J. Jordan and Mark R. Zito, their counsel, for their Second Amended Affirmative defenses to the First Amended Complaint filed the plaintiffs, Eric D. Hovde and Steven D. Hovde (the "Plaintiffs"), state as follows:

### ALLEGATIONS COMMON TO ALL AFFIRMATIVE DEFENSES

1. In May 2004, Riegel organized ISLA, a Minnesota limited liability company. Riegel was at all pertinent times ISLA's Manager, President and sole member.

2. In February 2005, Riegel organized JJBA Holdings LLC. (JJBA"), a Minnesota limited liability company.

3. Riegel caused Isla Development Mexico, S. de R.L. de C.V. ("Isla Mexico"), the Mexican corporation, to be incorporated in April 2005. ISLA was the 99.97% shareholder of Isla Mexico. JJBA Holdings LLC. (JJBA) owned the remaining 0.03% shares issued by Isla Mexico.

4. Isla Mexico was formed for the purpose of purchasing certain vacant lots or parcels and developing sixty-nine (69) condominium units and 15,000 square feet of office, restaurant, and other commercial space on Isla Mujeres, which is a barrier island located seven miles from Cancun, Mexico in the Caribbean Sea (the "La Isla Condos Project").

5. In April 2006, Riegel caused Novum Ingenieria, S.A. de C.V. ("Novum") to be incorporated. At all pertinent times, Riegel owned a controlling majority of the shares issued by Novum.

6. Novum was formed for the purpose of serving as the general contractor for construction of the La Isla Condos Project.

7. Isla Mexico and Novum were jointly obligated for all construction expenses. Isla Mexico was responsible for payroll expenses.

8. To fund Isla Mexico's development, ISLA borrowed funds from the Plaintiffs, which ISLA then delivered to Isla Mexico and/or Novum. Those funds were used to develop the subject property. Isla Mexico and Novum were contractually tied, such that Isla Mexico was responsible for Novum's debts.

9. ISLA, Riegel, JJBA, Isla Mexico and Novum are hereinafter referred to as the "ISLA Parties".

10. On or about June 2, 2005, ISLA, as maker, borrowed monies from the Plaintiffs under the terms of that certain Mortgage Note and Guaranty (the "Note") payable to the order of the Plaintiff in the original stated principal sum of $2,500,000. The Note is attached to Plaintiffs' First Amended Complaint as Exhibit "C" and incorporated by reference into these affirmative defenses.

11. All communications by the Plaintiffs were conducted by Steven Hovde, who informed Riegel that he was the Plaintiffs' designated representative.

12. On or about June 2, 2005, Isla Mexico, through funds delivered by ISLA, purchased Lot 14, known as the Foturin parcel on Isles Mujeres for $1,585,592. The Foturin parcel made up about 90% of land for the La Isla Condos Project.

13. On or about November 16, 2005, under the terms of the First Amendment to the Loan and Security Agreement, the Plaintiffs advanced to ISLA the sum of Four Thousand Two Hundred Twenty Nine and No/100 Dollars ($404,229), which ISLA delivered to Isla Mexico to be used for the purchase of Lot 15, known as the Kolb parcel on Isles Mujeres. The Kolb parcel made up the remaining 10% of the La Isla Condos Project. The First Amendment to Loan and Security Agreement is attached hereto as Exhibit 1 and incorporated by reference into these affirmative defenses.

14. Isla Mexico subsequently fused the Foturin parcel and the Kolb parcel into one parcel on or about May 4, 2006. The fusion document for the Foturin and Kolb Parcels is attached as Exhibit 2 and incorporated by reference into these affirmative defenses.

15. The ISLA Parties intended to conduct vigorous pre-sales and obtain low-level construction financing generating enough cash to complete the La Isla Condos Project inside of two years.

16. In late October 2005, less than (5) months after the closing of the purchase of the Foturin parcel, Isla Mujeres (and the greater Cancun area) were rocked by the largest storm in modern recorded history in the Atlantic basin, Hurricane Wilma. As a result of 48-hours of 150mph+ winds and 72-inches of rainfall on Isla Mujeres, the proposed plan to use the January to April 2006 high season to obtain pre-sales was effectively dismantled.

17. Robust pre-selling did not occur until January through June 2007, at which point, (17) pre-sales had been procured.

18. On July 26, 2007, ISLA executed the Second Amendment to Mortgage Note and Guaranty to document an additional draw of Five Hundred Thousand Dollars ($500,000) to be used to pay for construction costs incurred by ISLA and Isla Mexico. The Second Amendment to Mortgage Note and Guaranty is attached as Exhibit 3 and incorporated by reference into these affirmative defenses.

19. During the summer of 2007, Riegel undertook negotiations with Textron, Inc., a Fortune 200 company, to obtain an approximately $12,000,000 construction loan to complete the La Isla Condos Project. Textron required the Plaintiffs agree to subordinate their lien on the La Isla Condos Project until Textron received full payment.

20. The Plaintiffs declined on August 6, 2007 to subordinate their lien on the La Isla Condos Project and the negotiations with Textron terminated shortly thereafter.

21. Unable to obtain financing from Textron, ISLA proposed to the Plaintiffs that they provide the final $12,000,000 needed to complete the La Isla Condos Project, but the Plaintiffs declined to make the advance.

22. In late August 2007, Riegel began discussions with HSBC Bank in Mexico City regarding obtaining $12,000,000 to fund the completion of the La Isla Condos Project.

23. Already behind schedule by one-year due to Hurricane Wilma, ISLA entered into the Third Amendment to the Note and Loan with the Plaintiff on or about September 17, 2007. The Third Amendment to Mortgage Note and Guaranty is attached Plaintiffs' First Amended Complaint as Exhibit D and incorporated by reference into these affirmative defenses.

24. Under the Third Amendment to Mortgage Note and Guaranty, the Plaintiffs agreed to advance an additional $1,500,000 to be disbursed in three installments of $500,000 on September 17, October 15, and November 15, 2007, respectively. In reality, the Plaintiffs disbursed $1,500,000 as $500,000 on September 18, 2007, with the remaining $1,000,000 disbursed between November 9, 2007 and January 18, 2008, in eight equal increments of $125,000, thereby slowing construction progress even further ahead of the January 2008 high season. The wire transfer schedule is attached as Exhibit 4 and incorporated by reference into these affirmative defenses.

25. Due to the worsening of credit markets, ISLA sought non-institutional financing through Robinson Global Capital ("Robinson") in Minneapolis, Minnesota in November of 2007, who introduced Defendant and Plaintiffs to several options in 2008.

26. Prior to December 20, 2007, Riegel was married to Caroline Jean Riegel with whom he had been married since December 22, 1984.

27. On December 20, 2007, Riegel and Caroline Jean Riegel legally divorced in Dakota County Minnesota District Court, First Judicial District, Family Court Division, via Court Document 19F2-07-16298, which contained certain obligations of Riegel, namely making the house payment at 25222 Ipava Avenue, Lakeville, Minnesota, monthly spousal maintenance, and child support.

28. Following his divorce, Riegel attempted to liquidate personal assets to satisfy monies owed as a result of his divorce as set forth in ¶ 27 above, which monies totaled nearly $15,000 per month, including $8,000 for alimony, $1500 for child support, plus mortgage payments on his ex-wife's house of approximately $4,600 per month.

29. By mid-January, ISLA anticipated closing a loan with HSBC and the Plaintiffs tentatively agreed to subordinate their lien on the La Isla Condos Project.

30. During the last week of January 2008, HSBC effectively shut down its Latin American commercial development loan operations due to (in its own words) the worsening sub-prime and credit liquidity crisis in the United States and beyond.

31. On January 31, 2008, Jeffrey Riegel notified Steven Hovde, as the Plaintiff's designated representative, that HSBC denied Isla Mexico's request for funding due to the world financial crisis

32. Riegel immediately contacted Robinson and within one week, Robinson submitted the full La Isla Condos Project file to World Equity Partners ("WEP"), a private equity firm, based in Oklahoma City.

33. Beginning in late February 2008, WEP reviewed the La Isla Condos Project and subsequently issued a signed Letter of Commitment for a $20,000,000 loan to ISLA through which the Plaintiffs would have received full payment.

34. Riegel told Steven Hovde on February 13 and 14, 2008 that (a) he, Riegel, had no way of personally funding the La Isla Condos Project, as his only personal asset was a cabin property in Minnesota, which he did not have ability to borrow against, due to the current lending climate, and (b) the La Isla Condos Project would face immediate cessation without the infusion of money.

35. The Plaintiffs disbursed $240,000 through two emergency bridge loans with the face amount of $125,000 each on February 15 and February 22, 2008 under the Fourth Amendment to Mortgage Note and Guaranty. An unexecuted version of the Fourth

Amendment to Mortgage Note and Guaranty is attached as Exhibit 5 and incorporated by reference into these affirmative defenses.

36. On April 4, April 10, and April 15, 2008, the Plaintiffs delivered funds through three emergency bridge loans totaling $120,000 to ISLA, which ISLA used to fund past due amounts owed by Isla Mexico, including lienable items. These advances were not made pursuant to any signed loan document or amendment.

37. In April and June 2008, Jennifer and Kevin Amys loaned Isla Mexico $500,000 in two installments of $250,000. The advances were secured by the pre-selling of a block of condos (as previously recommended by Plaintiffs). Isla Mexico also collected progress payments from pre-sales of units through early August 2008, at which point all pre-sale deposits had been collected, and no new pre-sale deposits were pending.

38. On or about August 1, 2008, ISLA received a demand letter in the United States from Peter Kloepfer, (who was one of the La Isla Condos Project's pre-sale buyers) in which Mr. Kloepfer declared a default and made a demand on ISLA, which was a guarantor of $180,120 owed to Mr. Kloepfer, to pay the amounts owing to him, because Isla Mexico did not complete the condominium he contracted to purchase by the required July 30, 2008 delivery date. Peter Kloepfer's demand letter is attached as Exhibit 6 and incorporated by reference into these affirmative defenses.

39. ISLA did not have the available funds to honor the demand that was due at that time.

40. As of August 8, 2008, Isla Mexico had received $2,674,338 to be used in the La Isla Condos Project with all such funds having been expended for construction and other costs related to the construction of the La Isla Condos Project. No further pre-sale deposits

were collected after August 8, 2008. A La Isla Condos Project Current Totals and Pro Forma Statement as of August 8, 2008 is attached as Exhibit 7 and incorporated by reference into these affirmative defenses.

41. On or about August 7, 2008, Riegel informed Steven Hovde that the funding option with WEP was not forthcoming, therefore "paralyzing the project". Due to a lack of funds, construction ceased on August 15, 2008 and never re-started.

42. Without credit and operating funds, the Defendants and Isla Mexico could not operate the La Isla Condos Project nor continue construction, therefore on or about August 15, 2008, all construction work permanently ceased and all employees were furloughed (but not legally severed before the Mexican labor board).

43. On August 7, 2008, Riegel informed Steve Hovde, Plaintiffs' designated representative, in writing that Isla Mexico had to pay a payroll tax bill of $137,000 by August 18 and that the Hacienda informed Isla Mexico that the date was a firm date. Riegel stated that Isla Mexico would need roughly $250K to continue operations until mid-September. Riegel also stated, "Selling the property is an option that puts all of us woefully upside down and probably creates many problems with our 19 buyers." Riegel's August 7, 2008 email is attached as a part of Group Exhibit 8 and incorporated by reference into these affirmative defenses.

44. In response, Steve Hovde, Plaintiffs' designated representative, directed Riegel to shut down the La Isla Condos Project that Isla Mexico operated on Isla Mujeres stating, "I am not in the position right now to lend any additional money to Isla. Like many others, I have been pounded in the stock market and am not in a position to have any excess liquidity. As you may recall, last time I lent money I told you to shut the project down and I would

8

not be giving any additional money and you need to rely upon other sources and/or the WEP loan. I have not changed from that position." Steve Hovde's August 11, 2008 email is attached as a part of Group Exhibit 8 and incorporated by reference into these affirmative defenses.

45. By at least August 11, 2008, Riegel, for the Defendants and Isla Mexico informed Steven Hovde, Plaintiffs' designated representative, in writing that ISLA and Isla Mexico could not pay their respective debts as they came due. Riegel told Steven Hovde, as the Plaintiffs' designated representative, in writing that no funds were available to pay ISLA and Isla Mexico's debts.

46. On or about August 15, 2008, Isla Mexico terminated all construction activities.

47. Due to the cessation of construction mandated by the Plaintiffs, none of the approximately $5,731,271 to be collected at the closing of the sale of condominium units, as referenced in ¶ 40, was ever received. See, Current Totals and Pro Forma Statement Exhibit 7.

48. Based on emails delivered to Steven Hovde, Steven Hovde was advised that both ISLA and Isla Mexico were unable to pay their respective debts as they came due. Shutting down the La Isla Condos Project would ensure ISLA and Isla Mexico would not be able to pay debts that were due.

49. Riegel advised Steven Hovde, as the Plaintiffs' designated representative, and Steven Hovde, as the Plaintiffs' designated representative, was aware that the amount of debt owed by ISLA exceeded the value of its assets.

50. Riegel advised Steven Hovde, as the Plaintiffs' designated representative, and Steven Hovde, as the Plaintiffs' designated representative, was aware that the amount of debt owed by Isla Mexico exceeded the value of its assets.

51. On or about August 29, 2008, acting at Riegel's direction, Patrick Kelly, the Defendants' and Isla Mexico's attorney, spoke with Steven Hovde, as the Plaintiffs' designated representative, to discuss Isla Mexico's inability to pay its employees and its lack of funds to satisfy demands made by the Mexican authorities with respect to the social security and tax liens. Mr. Kelly told Steven Hovde, as the Plaintiffs' designated representative, that the Mexican authorities appeared to be in the process of commencing an action to foreclose upon the La Isla Condos Project's assets (i.e. land, fixtures, equipment, etc.). Mr. Kelly provided to Steven Hovde, as the Plaintiffs' designated representative, the amounts needed to pay the employees legally required severance pay, the accompanying social security obligations owing under Mexican law, and Hacienda (which is in the nature of the Mexican Internal Revenue Service) tax obligations owing under Mexican law. Mr. Kelly said Defendant and Isla Mexico funds were not available to pay these debts and advised Steven Hovde, as the Plaintiffs' designated representative, that it would be money well spent for the Plaintiffs to pay those amounts to avoid having the liens attach, or, if attached, be foreclosed upon. Mr. Hovde on behalf of the Plaintiffs, while understanding that the Defendants and Isla Mexico did not have the money to pay these debts, declined to lend funds to pay the amounts owing.

52. Riegel followed up with a detailed email to Steven Hovde, as the Plaintiff's representative, on September 2, 2008. The September 2, 2008 email is attached as Exhibit 9 and incorporated by reference into these affirmative defenses. In the September 2, 2008

email, Riegel described all unpaid debts that were due and that the Defendants and Isla Mexico were unable to pay those debts. In the email, Riegel stated that all workers and employees had been laid-off on August 15, 2008. In brief, Riegel presented to Steven Hovde, Option A (a commercial construction loan funded by October 1, 2008 by Starlite), or Option B (grooming the Project for liquidation), with both options at least $500,000 was required to either (A) maintain the status quo until October 1, 2008 or (B) terminate the Project and go into liquidation mode. Starlite failed to provide funding by October 1, 2008, or at any time thereafter. A summary of all the debts Isla Mexico and Novum totaling about $741,707 were incurred but could not pay due to the lack of funds is attached as Exhibit 10 and incorporated by reference into these affirmative defenses.

53. Subsequently, Steven Hovde, as the Plaintiffs' designated representative, and Riegel along with the Defendants' counsel discussed having the Defendants execute a Workout and Forbearance Agreement, which the Defendant's counsel prepared and delivered to Steven Hovde, as the Plaintiffs' designated representative, as a result of ISLA and Isla Mexico's inability to pay their debts as they came due. A draft of the Workout and Forbearance Agreement was circulated between September 17 and September 19, 2008, whereby liquidation of the La Isla Condos Project was contemplated. Steven Hovde provided comments on September 22, 2008, including responses concerning liquidation of the La Isla Condos Project and foreclosure.

54. Due to both ISLA and Isla Mexico's insolvency along with Riegel's ability to financially support ISLA and Isla Mexico and each of their inability to pay Debts as they came due, the La Isla Condos Project failed prior to November 2, 2008 leaving the value

11

of both ISLA and Isla Mexico's assets at a fair valuation less than the amounts each owed as liabilities.

55. By mid-2008, Riegel defaulted on his obligations to pay the house payment , and second mortgage, both to AmTrust Savings, a home equity loan to Anchor Bank, as well as spousal maintenance required in the December 20, 2007 divorce settlement. Riegel notified his ex-wife in early September 2008 that he was delinquent in making mortgage payments on her house as set forth in ¶ 28. As a result of his financial situation, Riegel admitted to his ex-wife in writing of his inability to pay his debts as they mature. Riegel's September 3, 2008 email is attached as a part of Group Exhibit 11 and incorporated by reference into these affirmative defenses.

56. The Plaintiffs seek to recover what they allege to be unpaid principal and interest due and owing to Plaintiffs under the terms of that certain Mortgage Note and Guaranty dated June 2, 2005, as amended, in the original principal amount of $2,500,000 (the "Note"). A true and correct copy of the Note is attached to the Amended Complaint as Exhibit "C".

57. The Plaintiffs filed their complaint initiating this lawsuit on November 2, 2018.

58. The Note on page 1 defines the defendant, ISLA Development LLC, as the "Borrower".

59. The Note on page 3 defines the defendant Jeffrey T. Riegel as "Riegel".

60. The Note on page 3 defines JJBA Holdings, LLC as "JJBA" and identifies JJBA as an affiliate of the Borrower.

61. The Note on page 3 defines Isla Development Mexico, S. de R.L. de C.V. as "Isla Mexico" and identifies Isla Mexico as the Borrower's subsidiary.

12

62. The Note on pages 9 and 10 at ¶ (d) defines "Events of Default" as follows:

> The occurrence of any one or more of the following events shall constitute an "Event of Default":
>
> … (d) An Act of Bankruptcy shall occur with respect to the **Borrower, Isla Mexico, JJBA or Riegel** (as used herein, "Act of Bankruptcy" shall mean if (i) the person shall (1) **be or become insolvent**, or (2) apply for or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator or the like of the person or of all or a substantial part of the person's property, or (3) commence a voluntary case under any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, liquidation or similar proceeding under the laws of any jurisdiction, or (4) file a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, or (5) **admit in writing its inability to pay its debts as they mature**, or (6) make an assignment for the benefit of its creditors; or (ii) a proceeding or case shall be commenced, without the application or consent of the person, and which is not dismissed within 30 days after such commencement, in any court of competent jurisdiction, seeking (I) the liquidation, reorganization, dissolution, winding up or the composition or adjustment of debts of the person, (2) the appointment of a trustee, receiver, custodian or liquidator or the like of the person or of all or any substantial part of the person's property, or (3) similar relief in respect of the person under any law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts); or …
>
> Note at pp. 9-10 (Emphasis supplied).

63. The Note at p. 10-11 sets forth "Remedies" and provides:

> If **(a) any Event of Default described in paragraph (d) in the Events of Default section above shall occur, the outstanding unpaid principal balance of the Note, the accrued interest thereon and all other obligations of the Borrower to the Bank under the Loan Documents shall automatically become immediately due and payable**; or (b) any other Event of Default shall occur and be continuing for fifteen (15) days after Borrower's receipt of written notice of such Event of Default from Lender (the "Default Notice"), then the Lender may declare the outstanding unpaid principal balance of the Note, the accrued and unpaid interest thereon and all other obligations of the Borrower to the Lender under the Loan Documents to be forthwith due and payable, whereupon the Note, all accrued and unpaid interest thereon and all such obligations shall immediately become due and payable, in each case without further demand or notice of any kind, all of which are hereby expressly waived, anything in this Note to the contrary notwithstanding. In addition, fifteen (15) day after Borrower's receipt of

> the Default Notice, the Lender may exercise all rights and remedies under any other instrument, document or agreement between the Borrower and the Lender, and enforce all rights and remedies under any applicable law, including, without limitation, exercising its rights under the Mortgage, the Isla Mexico Pledge, the Riegel Pledge and the Guaranty.

Note at pp. 10-11 (Emphasis supplied).

64. The "Remedies" section of the Note provides a clear, concise, distinct, and unambiguous remedy" of note acceleration should one of the Events of Default described in paragraph (d) occur. Unlike the other remedies in that section that require a notice being given, acceleration occurred when an Act of Bankruptcy occurred without the necessity of notice or demand.

65. The Note at Page 2 provides that when an Event of Default occurs, the debt owed by ISLA is due at that time:

> **Accelerated Payments**
>
> Upon the occurrence of an Event of Default (as defined below) and the acceleration of this Note as provided below, this Note shall be immediately due and payable. …
>
> Note at p. 2

66. As set forth in Events of Default section of the Note at § (d)(1), an Act of Bankruptcy was deemed to occur with respect to the ISLA, Isla Mexico, JJBA or Riegel if any one of them were or become insolvent.

67. As set forth in Events of Default section of the Note at § (d)(5), an Act of Bankruptcy was deemed to occur with respect to the ISLA, Isla Mexico, JJBA or Riegel if any one of them admit in writing its inability to pay its debts as they mature.

68. Under the Remedies section of the Note, the occurrence of an Act of Bankruptcy caused the outstanding unpaid principal balance of the Note, the accrued interest thereon

and all other obligations of the Borrower to the Bank under the Loan Documents to become automatically immediately due and payable without the necessity of demand.

69. The Note is governed by the laws of the State of Illinois. *See* Note at pp. 12.

70. Under Illinois law, actions promissory notes must be commenced within 10 years next after the cause of action accrued under 735 ILCS 5/13-206.

71. No payment or new promise to pay was made in writing on the Note on or after November 2, 2008.

### FIRST AFFIRMATIVE DEFENSE – ISLA'S INSOLVENCY

72. The Defendants reallege and incorporate paragraphs 1-71 inclusive of the Allegations Common to All Affirmative Defenses as paragraph 72 of the First Affirmative Defense as though fully set forth herein.

73. After the execution of the Note and prior to November 2, 2008, ISLA became insolvent in that the sum of ISLA debts were greater than all of ISLA's assets at a fair valuation.

74. ISLA's insolvency was an Act of Bankruptcy under the Note.

75. As a result of ISLA's insolvency, the Note became due prior to November 2, 2008.

76. The Plaintiffs filed their Complaint initiating this lawsuit on November 2, 2018.

77. More than ten years passed between the date of ISLA's insolvency and the date on which the Plaintiffs filed their Complaint.

78. The claims asserted by the Plaintiffs in the First Amended Complaint and each count thereof against the Defendants and each of them are barred by the applicable statute of limitation.

### SECOND AFFIRMATIVE DEFENSE - ISLA MEXICO'S INSOLVENCY

79. The Defendants reallege and incorporate paragraphs **1-71** inclusive of the Allegations Common to All Affirmative Defenses as paragraph 79 of the Second Affirmative Defense as though fully set forth herein.

80. After the execution of the Note and prior to November 2, 2008, Isla Mexico became insolvent in that the sum of Isla Mexico's debts were greater than all of Isla Mexico's assets at a fair valuation.

81. Isla Mexico's insolvency was an Act of Bankruptcy under the Note.

82. As a result of Isla Mexico's insolvency, the Note became due prior to November 2, 2008.

83. The Plaintiffs filed their Complaint initiating this lawsuit on November 2, 2018.

84. More than ten years passed between the date of Isla Mexico's insolvency and the date on which the Plaintiffs filed their Complaint.

85. The claims asserted by the Plaintiffs in the First Amended Complaint and each count thereof against the Defendants and each of them are barred by the applicable statute of limitation.

### THIRD AFFIRMATIVE DEFENSE - RIEGEL'S INSOLVENCY

86. The Defendants reallege and incorporate paragraphs 1-71 inclusive of the Allegations Common to All Affirmative Defenses as paragraph 86 of the Fourth Affirmative Defense as though fully set forth herein.

87. After the execution of the Note and prior to November 2, 2008, Riegel became insolvent in that the sum of his debts were greater than all of Riegel's assets at a fair valuation.

88. Riegel's insolvency was an Act of Bankruptcy under the Note.

89. As a result of Riegel's insolvency, the Note became due prior to November 2, 2008.

90. The Plaintiffs filed their Complaint initiating this lawsuit on November 2, 2018.

91. More than ten years passed between the date of Isla Mexico's insolvency and the date on which the Plaintiffs filed their Complaint.

92. The claims asserted by the Plaintiffs in the First Amended Complaint and each count thereof against the Defendants and each of them are barred by the applicable statute of limitation.

### FOURTH AFFIRMATIVE DEFENSE – ISLA MEXICO'S ADMISSION IN WRITING OF ITS INABILITY TO PAY ITS DEBTS AS THEY MATURE

93. The Defendants reallege and incorporate paragraphs 1-71 inclusive of the Allegations Common to All Affirmative Defenses as paragraph 93 of the Fourth Affirmative Defense as though fully set forth herein.

94. After the execution of the Note and prior to November 2, 2008, Riegel, on behalf of Isla Mexico, admitted to Steven Hovde, as the Plaintiff's designated representative, in writing that Isla Mexico was unable to pay its debts as they matured.

95. Isla Mexico's written admission concerning its inability to pay its debts as they matured was an Act of Bankruptcy under the Note.

96. As a result of Isla Mexico's written admission concerning its inability to pay its debts as they matured, the Note became due prior to November 2, 2008.

97. The Plaintiffs filed their Complaint initiating this lawsuit on November 2, 2018.

98. More than ten years passed between the date of Isla Mexico's stated in writing that it was unable to pay its debts as they matured and the date on which the Plaintiffs filed their Complaint.

99. The claims asserted by the Plaintiffs in the First Amended Complaint and each count thereof against the Defendants and each of them are barred by the applicable statute of limitation.

### FIFTH AFFIRMATIVE DEFENSE – ISLA'S ADMISSION IN WRITING OF ITS INABILITY TO PAY ITS DEBTS AS THEY MATURE

100. The Defendants reallege and incorporate paragraphs 1-71 inclusive of the Allegations Common to All Affirmative Defenses as paragraph 100 of the Fourth Affirmative Defense as though fully set forth herein.

101. After the execution of the Note and prior to November 2, 2008, Riegel, on behalf of ISLA, admitted to Steven Hovde, as the Plaintiff's designated representative, in writing that ISLA was unable to pay its debts as they matured.

102. ISLA's written admission concerning its inability to pay its debts as they matured was an Act of Bankruptcy under the Note.

103. As a result of ISLA's written admission concerning its inability to pay its debts as they matured, the Note became due prior to November 2, 2008.

104. The Plaintiffs filed their Complaint initiating this lawsuit on November 2, 2018.

105. More than ten years passed between the date of ISLA's stated in writing that it was unable to pay its debts as they matured and the date on which the Plaintiffs filed their Complaint.

106. The claims asserted by the Plaintiffs in the First Amended Complaint and each count thereof against the Defendants and each of them are barred by the applicable statute of limitation.

WHEREFORE, defendants, ISLA Development LLC and Jeffrey T. Riegel, respectfully pray that plaintiffs, Eric D. Hovde and Steven D. Hovde, recover nothing from

the defendants under Plaintiffs' First Amended Complaint, that costs be assessed against the Plaintiffs, and for such other and further relief as is just and proper.

                                                **ISLA DEVELOPMENT LLC AND JEFFREY T. RIEGEL**

                                      By:   /s/ Gregory J. Jordan
                                                    One of Their Attorneys

Gregory J. Jordan (ARDC# 6205510)
Mark R. Zito (ARDC# 6276231)
Jordan & Zito LLC
55 West Monroe St., Suite 3600
Chicago IL 60603
(312) 854-7181 (Telephone)
gjordan@jz-llc.com
mzito@jz-llc.com

COUNSEL FOR ISLA DEVELOPMENT LLC AND JEFFREY T. RIEGEL