IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ERIC D. HOVDE, and <br> STEVEN D. HOVDE, | ) <br> ) <br> ) | |
| Plaintiffs, | ) <br> ) | |
| v. | ) <br> ) | 18 C 7323 |
| ISLA DEVELOPMENT LLC, and <br> JEFFREY T. RIEGEL, | ) <br> ) <br> ) | Judge John Z. Lee |
| Defendants. | ) <br> ) | |

## MEMORANDUM OPINION AND ORDER

Surrounded by the serene waters of the Caribbean Sea, Isla Mujeres sits just seven miles off the coast of Cancun, Mexico. Sensing the island's promise as a vacation destination, Jeffrey Riegel formed ISLA Development LLC ("ISLA") with plans to build a condominium development. To fund the venture, Riegel secured millions of dollars in loans from Steve and Eric Hovde. Just as Riegel's team broke ground, however, the 2007 financial crisis began. Within a year, Riegel's resources ran out, funding dried up, and construction ceased.

About a decade later, the Hovdes sued ISLA and Riegel to collect on the loans, which had never been repaid. At this stage, the parties have submitted competing motions for summary judgment as to whether the statute of limitations bars the Hovdes's suit. For the reasons below, the Court grants summary judgment in Defendants' favor as to ISLA's Note and grants summary judgment in the Hovdes's favor as to Riegel's Guaranty.

I.  **Background**[1]

A.  **The Loan Agreement**

Riegel formed ISLA in 2004 and acted as its manager and sole member. Defs.' Stmt. Additional Facts ("Defs.' SOAF") ¶ 1, ECF No. 85. Then as now, ISLA's main asset was its 99.7% interest in ISLA Mexico, a Mexican corporation Riegel organized.[2] *Id.* ¶¶ 3–5. From the outset, ISLA's mission was to purchase and develop land on Isla Mujeres. *Id.* ¶ 7.

To fund that project, ISLA secured a series of loans from Steve and Eric Hovde. *Id.* ¶ 12; Pls.' Ex. 2, Loan Agreement § 3, ECF No. 78-1. In exchange, ISLA promised to pay the Hovdes a 25% interest rate, *id.* at ¶ 15; Pls.' Stmt. Material Facts ("Pls.' SOF") ¶ 10, ECF No. 80; Pls.' Ex. 3, Mortgage Note and Guaranty ("Note") at 1, ECF No. 78-1, and Riegel agreed to act as a guarantor, *see* Pls.' Ex. 5, Continuing Unconditional Guaranty ("Guaranty") at 1, ECF No. 78-1.

Although the Note specified that the principal and interest on the loans would be due in June 2007, it also empowered the Hovdes to seek immediate repayment if certain "Events of Default" occurred. Note at 1, 9–10. For instance, if Riegel, ISLA, or ISLA Mexico ever "bec[a]me insolvent" or "admit[ted] in writing [their] inability to pay [their] debts as they mature," *id.* at 9 § d(1),(5), the Note

---

[1] The following facts are undisputed or have been deemed admitted, unless otherwise noted.

[2] JJBA, another entity organized by Riegel, owns the remaining 0.3% of shares. Defs.' SOAF ¶ 6.

dictated that "the accrued interest thereon and all other obligations of the Borrower . . . shall automatically become immediately due and payable," *id.* at 10.

**B.  The Debtors' Difficulties**

Buffeted by the economic downturn that began in 2007, the parties repeatedly renegotiated the Note. In the third such revision, they updated the clause that had required "Payment of Principal and Interest" that June. Pls.' Ex. 4, 3d Amend. Note § 2, ECF No. 78-1. As amended, the provision postponed ISLA's duty to make payments until February 28, 2009. *Id.*

By the summer of 2008, Riegel feared that the project was in dire financial straits. Desperate to save ISLA, Riegel emailed Steve Hovde to ask for more money. Defs.' SOAF ¶ 23; Defs.' Ex. 1, 8/7/09 Email from J. Riegel to S. Hovde, ECF No. 89-1. A lack of funding had "paralyz[ed] the project," Riegel complained. Defs.' SOAF ¶¶ 23, 26. "Selling the property," Riegel added, "is an option that puts all of us woefully upside down."[3] *Id.* ¶ 27. In response, Steve Hovde advised Riegel to either "shut the project down" or "rely upon other [funding] sources." *Id.* ¶¶ 28–31. A few days later, Riegel halted construction on the condos. *Id.* ¶ 31.

That September, Riegel again warned Steve Hovde about the debtors' perilous financial situation. *Id.* ¶¶ 34–35; Defs.' Ex. 3, 9/2/08 Email from J. Riegel to S. Hovde at 4, ECF No. 81-4. Convinced that the project needed an infusion of

---

[3]  Plaintiffs admit that Riegel's August email included these statements, but dispute whether they reflected ISLA's true financial condition. *See* Pls.' Response Defs.' Stmt. Additional Facts ("Pls.' RSOAF") ¶¶ 23–34, ECF No. 85.

3

cash, Riegel revealed that his own "resources [were] exhausted."[4] *Id.* ¶ 36. He went on to estimate that the liquidation value of the project was between $6 and $7 million, which was less than the amount owed to the Hovdes.[5] *Id.* ¶ 40.

Soon after, the parties negotiated a Forbearance Agreement, *id.* ¶ 44. Under that Agreement, which became effective on November 5, 2008, the Hovdes promised to refrain "from exercising [any of the] remedies" outlined in the loan documents. Pls.' Ex. 12, Forbearance Agreement § 4, ECF No. 78-2. Although the Agreement expired in mid-December 2008, see Pls.' Mem. Supp. Mot. Summ. J. at 9, ECF No. 77, Defendants never repaid the loans, see Pls.' SOF ¶ 17.

### III. <u>Legal Standard</u>

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has sufficiently demonstrated the absence of a genuine issue of material fact, the nonmovant must then set forth specific facts demonstrating that there are disputed material facts that must be decided at trial. *Id.* at 321–22.

---

[4] Again, Plaintiffs concede that Riegel's September email contained these statements, but contest their accuracy. *See* Pls.' RSOAF ¶¶ 34–39.

[5] Plaintiffs have moved to strike Riegel's testimony as whether and when ISLA Mexico became insolvent. *See* Mot. Strike, ECF No. 83. As explained below, that motion is granted in part and denied in part.

4

## IV. Analysis

### A. Motions to Strike

As a threshold matter, the Hovdes challenge the admissibility of an affidavit submitted by Riegel.[6] *See* Defs.' Ex. A, Riegel Decl., ECF No. 81-1. In that declaration, Riegel describes messages he sent to Steve Hovde in 2008 detailing the project's assets, debts, and cash flow. *See, e.g.*, *id.* ¶¶ 26, 39, 40. The Hovdes maintain that Federal Rule of Civil Procedure 56(c)(4), along with Federal Rules of Evidence 701 and 702, bars that testimony.[7]

To the extent that Defendants seek to use Riegel's opinions to establish the true value of the land on Isla Mujeres, the motion to strike is granted. According to Rule 56(c)(4), "[a]n affidavit or declaration . . . [must] show that the affiant or declarant is competent to testify on the matters stated." But nothing in the affidavit suggests that Riegel has any experience appraising real estate. Indeed, Defendants concede that Riegel cannot testify as to the likely sale price of the property. *See* Mem. Opp'n Mot. Strike at 3, ECF No. 88.

To the extent that Defendants offer Riegel's affidavit to demonstrate that they could not pay their debts in 2008, however, the motion to strike is denied.

---

[6] The Hovdes submitted two largely identical motions to strike: one to strike Riegel's affidavit as used to resist Plaintiffs' motion for summary judgment, and another to strike that affidavit as used to support Defendants' similar motion. *See* Mot. Strike, ECF No. 83; Mot. Strike, ECF No. 105.

[7] The Hovdes also argue that Riegel's affidavit improperly asserts that ISLA Mexico was obligated to pay the expenses of Novum Ingeneria, a construction firm. *See* Riegel Decl. ¶¶ 17, 20. Because ISLA Mexico's relationship with Novum makes no difference to the resolution of the summary judgment motions, the Court declines to reach that issue.

5

Although the briefing is not entirely clear, the Hovdes do not seem to question the admissibility of Riegel's testimony as to this issue. Nor can they. As ISLA's sole organizer and manager, see Defs.' SOAF ¶ 1, Riegel would necessarily retain personal knowledge about its cash flow. *See, e.g.*, *Uncommon, LLC v. Spigen, Inc.*, 305 F. Supp. 3d 825, 852 (N.D. Ill. 2018) ("[I]t may sometimes be inferred that the affiant had knowledge of certain events based upon his position within an organization.") (citation omitted).

At bottom, the motions to strike turn out to be much ado about nothing. Defendants admit that Riegel cannot opine about the actual value of the land, and Plaintiffs do not object to Riegel's testimony concerning ISLA's inability to pay its debts. Thus, the motions to strike are granted in part and denied in part.

**B.   Motions for Summary Judgment**

The Hovdes seek repayment of their loans on two grounds. Their primary claim is that ISLA failed to make good on its debts as required by the Note. They also accuse Riegel of neglecting to honor the Guaranty. Defendants retort that the statute of limitations bars both claims.

**1.   The Note**

To determine whether the statute of limitations prevents the Hovdes from recovering on the Note, the Court must answer three questions. First, would the occurrence of an Event of Default, as defined in the Note, have caused the Hovdes' claim to accrue? Second, did an Event of Default take place prior to November 2, 2008 (ten years before the Hovdes filed this lawsuit)? And finally, did the Loan

6

Agreement, Third Amendment, or Foreclosure Agreement reset the limitations clock or waive the debtors' timeliness defense? The Court addresses each question in turn.

### a. An "Event of Default" Triggers the Hovdes's Right To Bring Suit

Because a ten-year limitations period governs the Hovdes' claim, see 735 Ill. Comp. Stat. 5/13-206, and because they filed suit on November 2, 2018, their claim is untimely if it accrued before November 2, 2008. Under Illinois law, a claim accrues "when facts exist which authorize the bringing of an action."[8] *Armstrong v. Hedlund Corp.*, 738 N.E.2d 163, 169 (Ill. App. Ct. 2000) (citing *Kozasa v. Guardian Elec. Mfg. Co.*, 425 N.E.2d 1137, 1142 (1981)). Thus, the question here is when the loan agreements permitted the Hovdes to "legally demand payment." *Id.*

In construing those agreements, the Court's task is "to determine and give effect to the intent of the parties." *A.T.N., Inc. v. McAirlaid's Vliesstoffe GmbH & Co. KG*, 557 F.3d 483, 485 (7th Cir. 2009) (applying Illinois law). To that end, the Court "look[s] to the contract as a whole . . . adopting an understanding of the language that is natural and reasonable." *Land of Lincoln Goodwill Indus. Inc., v. PNC Fin. Servs. Grp., Inc.*, 762 F.3d 673, 679 (7th Cir. 2014). In doing so, the Court must "attempt to give meaning to every provision of the contract and avoid a construction that would render a provision superfluous." *Id.* (citation omitted).

---

[8] The parties do not dispute that Illinois law applies, or that the accrual of the Hovdes's claim turns on Illinois law. *See Wood v. Mid-Valley, Inc.*, 942 F.2d 425, 426–27 (7th Cir. 1991).

7

These principles confirm that the Hovdes's claim accrued as soon as an "Event of Default," as defined in the Note, occurred. As relevant here, two different parts of the Note empower the Hovdes to sue. First, the "Payment of Principal and Interest" provision clarifies that "[t]his Note is payable on June 2, 2007, when the entire unpaid balance of principal and interest shall be due and payable in full." Note at 1. Due to construction delays and economic setbacks, the parties repeatedly amended that language to postpone the repayment date. *See, e.g.*, 3d Amend. § 2, ECF No. 78-1.

Second, a separate "Events of Default" provision accelerates the payment schedule under some circumstances. *See* Note at 9 § 4. Salient to our inquiry, if the borrowers "become insolvent" or "admit in writing [their] inability to pay [their] debts as they mature," *id.* 9 § 4(d)(i)(1),(5), "the outstanding unpaid principal balance of the Note, the accrued interest thereon, and all other obligations of the borrower to the Bank . . . automatically become immediately due and payable." *Id.* at 10. If and when such events took place, the loan agreements authorized the Hovdes to "immediately" demand repayment, even if the date listed in the Payment section had not yet passed. *Id.*

        **b.    An Event of Default Occurred Before November 2, 2008**

The next question is: did an Event of Default take place and when? In other words, did Defendants either: (1) "admit[tted] in writing [their] inability to pay [their] debts as they mature" or (2) "bec[a]me insolvent" more than ten years before

November 2, 2018. Note at 9 § 4(d)(i)(1),(5). The Court's analysis begins—and, in this case, ends—with the language in the Note.

At the outset, the parties disagree about what it means to "admit in writing [an] inability to pay." *Id.* at 9 § 4(d)(i)(5). First, they contest what counts as a written admission. Must the writing "state that Defendants [are] in default," as the Hovdes assume? Pls.' Resp. at 14, ECF No. 102. Or would any writing that acknowledges unpaid debts qualify, as Defendants suppose, even if it offers no hint that it is meant to trigger acceleration?

A review of the "contract as a whole" settles this debate. *Land of Lincoln*, 762 F.3d at 679.[9] For some Events of Default, the Note demands that the lenders issue a "Default Notice" alerting the borrowers that the debt will be accelerated. Note at 10. That demonstrates that the drafters knew how to write a provision requiring formal notice of defaults. They declined to include a similar requirement in the inability-to-pay clause, and the Court must honor that choice.

Second, the parties dispute whether it is sufficient for borrowers to say they cannot pay their debts, or whether must prove that they are actually unable to do so.[10] Again, the text and structure of the Note dispel this uncertainty. It is true

---

[9] The Court finds that the pertinent terms in the loan agreements are unambiguous, and the parties do not argue otherwise. *See William Blair & Co., LLC v. FI Liquidation Corp.*, 830 N.E.2d 760, 770 (Ill. App. Ct. 2005) (a term is unambiguous "if a court can ascertain its meaning from the general contract language").

[10] Both parties cite the Forbearance Agreement, which was executed well after the loan agreements, as supporting their preferred interpretation of the inability-to-pay clause. As discussed here, the text and structure of the Note resolves the parties' dispute, making it unnecessary to consider extrinsic evidence. *See Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999). In any case, the Forbearance Agreement supports

that some Events of Default depend on the debtors' actual financial condition. For instance, the "become[s] insolvent" clause looks to the true state of the borrowers' balance sheets. Note at 9 § d(1)(i). But other Events, such as filing a bankruptcy petition or applying for a trustee, turn on what the debtor tells others, regardless of the underlying reality. *See id.* at 9 § d(1)(i)(2),(4). Because the inability-to-pay provision focuses on what the borrowers "admit in writing," it falls squarely within the latter category. *Id.* at 9 §d(1)(i)(5).

The remaining task is to decide whether Defendants triggered the inability-to-pay clause before November 2, 2008. To show that they did so, Defendants spotlight a series of emails Riegel sent Steve Hovde. In early August, for example, Riegel described the debtors' financial condition this way:

> The most important issue is a tax bill of $137K which must be paid by August 18. We were notified by Hacienda yesterday that this date is absolute. We have been buying time with the tax officials most of the late spring and summer but now the date is non-negotiable.

8/7/08 Email from J. Riegel to S. Hovde at 3.

A few weeks later, Riegel shared another update on the project's finances. *See* 9/2/08 Email from J. Riegel to S. Hovde. He began by highlighting the project's cash flow problems:

> [F]unds of $75K are needed by Wednesday morning to avoid having Social Security persons in Mexico shut down the entire operation immediately (please see attached budget). We are now on about our 5th extension and Alberto was told that trucks would be coming to clean out all computer equipment from our offices and other assets and materials at the construction site early this week to pay the social

---

Defendants' reading because the parties would only have gone to the trouble of negotiating that Agreement if they believed an Event of Default had occurred.

> security bill owed. Such an action would be the instant death of the project . . . .

*Id.* at 3. He went on to warn that:

> Steve, I am very "stand up" guy, but at this point, with no resources of my own, I would not be able to attempt re-assembling a team on the ground, even if I wanted to.

*Id.*

To review, Riegel advised Hovde that the project: (1) owed substantial sums of money, (2) lacked any "resources" to pay those debts, (3) had already requested multiple extensions, and (4) expected its equipment to be repossessed. *See id.* at 2–3. Taken together, these emails constitute a written admission that ISLA and ISLA Mexico could not pay their debts.

In the Hovdes's view, these emails merely "request[ed] . . . additional loan proceeds."[11] Pls.' Resp. at 14. But, what matters here is that Riegel admitted the project's inability to pay its debts, and the fact that he was seeking additional funding from other sources only confirms this assertion. The upshot is that an Event of Default occurred by August 2, 2008, over ten years before the Hovdes filed this suit.

---

[11] The Hovdes also make much of an email Riegel sent on November 5, 2008 suggesting that a bridge loan from outside investors would resolve all "outstanding payables or liens." Pls.' Stmt. Additional Facts ("Pls.' SOAF") ¶¶ 9–10, ECF No. 104. But the September 2 email accelerated the debt "immediately," regardless of whether Riegel later secured additional funding. Note at 10. Besides, that Riegel sought investors to provide a bridge loan does not support the Hovdes's position; if anything, it confirms that Defendants could not cover their debts on their own.

### c. None of the Loan Documents Waive or Reset the Statute of Limitations

The final question is whether any other provisions of the Loan Agreement, Third Amendment, or Forbearance Agreement defeat the debtors' statute of limitations defense. As the Hovdes see it, each of those documents either waives the timeliness defense or resets the limitations clock.

They first highlight a clause in the Loan Agreement specifying that "[n]othing herein contained shall impose upon Lender any obligation to enforce any terms, covenants, or conditions contained in this agreement and the other Loan documents." Loan Agreement § 17. But the limitations clock starts ticking at "[t]he moment a creditor *may* legally demand payment." *Mazur v. Stein*, 41 N.E.2d 979, 982 (Ill. App. Ct. 1942) (emphasis added). Thus, the question is not when the Hovdes were obliged to file, but when they could have done so. The cited clause does little to illuminate that question.

To the extent that the Hovdes believe this language meant that Defendants were waiving any statute of limitations defense in any future lawsuits, their reading is flawed. Although Illinois law permits parties to waive their "right to invoke a statute-of-limitations defense," they must do so "expressly." *Hassebrock v. Ceja Corp.*, 29 N.E.3d 412, 423 (Ill. App. Ct. 2015) (citing *Bailey v. Petroff*, 525 N.E.2d 278, 283 (Ill. App. Ct. 1988)). For example, clauses waiving "each and every defense," *Chrysler Credit Corp. v. Marino*, 63 F.3d 574, 577 (7th Cir. 1995), "every defense, counterclaim or set off," *NBD Bank, N.A. v. Wecker*, 1992 WL 201931, at *2 (N.D. Ill. Aug. 13, 1992), or "[a]ny defenses," *BA Mortg. & Int'l Realty Corp. v. Am.*

12

*Nat. Bank & Tr. Co. of Chi.*, 706 F. Supp. 1364, 1376 (N.D. Ill. 1989), constitute express waivers. By contrast, the clause here focuses on the Hovdes' obligations under the Loan Agreement, and says nothing at all about the debtors' defenses. *See* Loan Agreement § 17. Accordingly, the Loan Agreement does not operate as a waiver of the statute of limitations.

The Hovdes also cite to the Third Amendment, but this too provides little help. That Amendment revised the Note's Payment provision to delay the repayment date until February 2009. *See* 3d Amend. Note § 2. But it made no changes to the Events of Default provision. To the contrary, it provided that "[e]xcept as expressly set forth [here] . . . all other terms and conditions [of the Note] . . . shall remain in full force and effect." *Id.* § 4. Thus, while the Amendment prevented the Hovdes from bringing suit based on the Payment provision until at least February 2009, it left open the possibility that an Event of Default would accelerate their right to sue. The Hovdes's contrary construction of the Third Amendment would make the Events of Default section "superfluous," a disfavored outcome that they fail to justify. *See Land of Lincoln*, 762 F.3d at 679.

That leaves the November 5, 2008, Forbearance Agreement. In contrast to the Third Amendment's narrow focus on the Payment provision, the Forbearance Agreement broadly requires that the Hovdes refrain from exercising any "remedies" created by the Note. Forbearance Agreement § 4. It follows that they could not have demanded payment under the Note's Events of Default provision while the Forbearance Agreement remained in force. But, given that an Event of Default

occurred prior to November 5, 2008, the Hovdes' breach of contract claim started to accrue by the time the parties entered the Forbearance Agreement.

In response, the Hovdes suggest that the Forbearance Agreement tolled the statute of limitations. But that Agreement makes no mention of tolling. And, even assuming that the Forbearance Agreement did toll any prior claims, the agreement was in effect only from November 5 to December 17, 2008. *See* Pls.' Mem. Supp. Mot. Summ. J. at 9. Taking that forty-two day pause into account, together with the fact that an Event of Default had occurred by September 2, 2008, the Hovdes would still have needed to bring their claim by October 14, 2018. Instead, they initiated this action on November 2, about three weeks too late.

To be sure, Riegel repeatedly asked the Hovdes for more time to try to remedy Defendants' financial predicament and salvage the project. And the Hovdes, for business reasons or otherwise, grudgingly obliged. But the Hovdes knew by December 2008 that the project's financial woes were beyond repair. It is difficult to fathom why they sat on their hands until November 2018 before filing suit.[12]

---

[12] It also should be noted that the Hovdes do not raise the doctrine of equitable tolling in their briefs, thereby waiving it. *See M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("[U]ndeveloped arguments are waived[.]"). In any case, that doctrine cannot save them here. As the Seventh Circuit has explained, equitable tolling applies when "it would have been unreasonable to expect [a plaintiff] to sue earlier." *Shropshear v. Corp. Counsel of City of Chi.*, 275 F.3d 593, 595 (7th Cir. 2001) (citations omitted). Here, however, the Hovdes admit that the Forbearance Agreement expired on December 17, 2008. *See* Pls.' Mem. Supp. Mot. Summ. J. at 9. Given that the Hovdes failed to file suit for more than nine years after that date, they cannot invoke equitable tolling. *See, e.g.*, *Shropshear*, 275 F.3d at 595 (finding that the plaintiff "flunk[ed] equitable tolling . . . because he admits having waited for more than a year [to file suit].").

In the end, Riegel's emails constituted an Event of Default by September 2, 2008, and permitted the Hovdes to seek immediate acceleration of the loan and file suit. Because the Hovdes elected not to do so and waited over a decade before bringing this lawsuit, their claim to recover on the Note is barred by the statute of limitations.

### 2. The Guaranty

Although much of the briefing assumes that the Hovdes's claims to enforce the Note and the Guaranty rise or fall together, this is incorrect. In fact, Illinois law provides that "[e]ven though no principals remain on [a] note, [a] defendant may still be liable if the guaranty contract expressly provides for continuing liability." *Riley Acquisitions, Inc. v. Drexler*, 946 N.E.2d 957, 964–65 (Ill. App. Ct. 2011). As relevant here, Riegel made a "continuing" promise to pay back the loans, "irrespective of . . . the validity or enforceability of Borrower's liabilities." Guaranty at 3. That means that the Hovdes's inability to recover on the Note does not prevent them from enforcing the Guaranty against Riegel.

Echoing their earlier arguments, Defendants maintain that the Hovdes's claim as to the Guaranty is time-barred because it accrued by September 2, 2008. But Illinois courts allow guarantors to waive "the right to invoke a statute-of-limitations defense." *See Klancir v. BNSF Ry. Co.*, 40 N.E.3d 438, 446 (Ill. App. Ct. 2015) (citation omitted). And, here, Riegel explicitly vowed that his "obligations under this Guaranty shall be unconditional" regardless of "any other circumstance

15

that might otherwise constitute a legal or equitable discharge or defense."[13] Guaranty at 4. Such language qualifies as a waiver of all affirmative defenses, including the statute of limitations. *See, e.g.*, *FIMSA, Inc. v. Unicorp Fin. Corp.*, 759 F. Supp. 1297, 1301 (N.D. Ill. 1991) (interpreting similar language as waiving all affirmative defenses). Seeing no other barriers to the enforcement of the Guaranty (and Riegel having raised none), the Court concludes that the Hovdes are entitled to summary judgment as to this issue.

## **Conclusion**

---

[13] Although the Hovdes did not include this argument in their summary judgment motion, see Mem. Supp. Summ. J., ECF No. 77, they raised it in their response to Defendants' competing motion, giving Defendants a fair opportunity to reply, see Pls.' Resp. at 5–6, ECF No. 102. Defendants failed to do so.

For the reasons given above, the Court grants summary judgment in Defendants' favor as to the Note and grants summary judgment in the Hovdes's favor as to the Guaranty. The motions to strike are granted in part and denied in part as noted herein; the motion objecting to Defendants' filing of a summary judgment motion is denied; and the motion to dismiss is denied as moot. By _____, 2020, the Hovdes are directed to file a motion for entry of judgment as to damages based on the Guaranty.

**IT IS SO ORDERED.**  **ENTERED: 7/31/20**

								_____
								**JOHN Z. LEE**
								**United States District Judge**